## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ———————————————————— ) | |
| **YURY MELISSA AGUIRIANO** ) | |
| **ROMERO,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **25-11631-BEM** |
| ) | |
| **PATRICIA HYDE, et al.,** ) | |
| ) | |
| **Respondents.** ) | |
| ———————————————————— ) | |

### <u>MEMORANDUM ON PETITION FOR WRIT OF HABEAS CORPUS</u>

**MURPHY, J.**

This case is the latest in a growing number of challenges in this District, and across the country, to non-citizen detention arising out a decision by the Department of Homeland Security to radically alter its interpretation of the immigration statutes. Previously, in a similar instance, this Court concluded that the interpretation being advanced by the Government, which would require the mandatory detention of hundreds of thousands, if not millions, of individuals currently residing within the United States, is contrary to the plain text of the statute and the overall statutory scheme. *Diaz Martinez v. Hyde*, — F. Supp. 3d —, 2025 WL 2084238 (D. Mass. July 24, 2025); *see also, e.g.*, *Rodriguez Vazquez v. Bostock*, — F. Supp. 3d —, 2025 WL 1193850 (W.D. Wash. Apr. 24, 2025) (holding same); *Gomes v. Hyde*, 2025 WL 1869299 (D. Mass. July 7, 2025) (same); *Garcia v. Hyde*, Civ. No. 25-11513 (D. Mass. July 14, 2025) (same); *Rosado v. Bondi*, 2025 WL 2337099 (D. Ariz. Aug. 11, 2025) (same), *report and recommendation adopted without objection*, 2025 WL 2349133 (D. Ariz. Aug. 13, 2025); *Lopez Benitez v. Francis*, — F. Supp. 3d —, 2025 WL 2371588 (S.D.N.Y. Aug. 13, 2025) (same); *dos Santos v. Lyons*, 2025 WL 2370988 (D. Mass.

Aug. 14, 2025) (same); *Aguilar Maldonado v. Olson*, 2025 WL 2374411 (D. Minn. Aug. 15, 2025) (same); *Escalante v. Bondi*, 2025 WL 2212104 (D. Minn. July 31, 2025) (granting preliminary relief after positively weighing likelihood of success), *report and recommendation adopted sub nom. O. E. v. Bondi*, 2025 WL 2235056 (D. Minn. Aug. 4, 2025); *Arrazola-Gonzalez v. Noem*, 2025 WL 2379285 (C.D. Cal. Aug. 15, 2025) (granting individualized bond hearings on ex parte motion for temporary restraining order after finding likelihood of success); *Garcia Jimenez v. Kramer*, 2025 WL 2374223 (D. Neb. Aug. 14, 2025) (granting relief from stay of bond order pending BIA appeal); *Mayo Anicasio v. Kramer*, 2025 WL 2374224 (D. Neb. Aug. 14, 2025) (same); *Rodrigues De Oliveira v. Joyce*, 2025 WL 1826118 (D. Me. July 2, 2025) (recognizing disagreement as to the detention statutes and granting habeas petition on due process grounds). *But see Pena v. Hyde*, 2025 WL 2108913 (D. Mass. July 28, 2025).[1]

Following a hearing on August 8, 2025, the Court reached again the same conclusion, finding that the Petitioner was detained as a matter of discretion under 8 U.S.C. § 1226 ("section 1226"), rather than mandatorily under 8 U.S.C. § 1225(b)(2)(A) ("section 1225(b)(2)(A)"), and ordering that she receive a bond hearing as provided for under section 1226 and its implementing regulations. Dkt. 31. The Court also noted that it would provide a written opinion explaining its decision and responding to new arguments not presented in the Court's previous encounter with this issue.

---

[1] In *Pena*, another session of this court stated without discussion that section 1225 "authorizes the detention of any alien who 1) is "an applicant for admission" to the country and 2) is "not clearly and beyond doubt entitled to be admitted." *Pena*, 2025 WL 2108913, at *1. The focus of the case was on a different issue, the effect of an approved I-130 petition. *Id.* From the limited facts presented, it is unclear whether the *Pena* petitioner was similarly situated to the petitioners in the other cited cases. *Id.*

# I.    Background

## A.    Factual Background

On or about December 4, 2021, Petitioner and her family were encountered by United States Border Patrol.  Dkt. 17-1 ¶ 6.  Two days later, an officer determined that Petitioner had entered the United States on the same day as the initial encounter and executed an administrative warrant for her arrest "as authorized by section 236 of the Immigration and Nationality Act," codified at section 1226.  Dkt. 28 (Amended Complaint, or "Compl.") at 27.[2]  At about the same time, Petitioner was issued a Notice to Appear in immigration court for "removal proceedings under section 240 of the Immigration and Nationality Act," codified at 8 U.S.C. § 1229a ("section 1229a").  Compl. at 23.[3]  Specifically, Petitioner was charged with being removable as "an alien present in the United States without being admitted or paroled."  *Id*.  Petitioner was thereafter released on her own recognizance "[p]urusant to the authority contained in section 236 of the Immigration and Nationality Act," codified at section 1226, "and part 236 of title 8, Code of Federal Regulations."  *Id*. at 29.[4]

On February 16, 2023, following a hearing before an Immigration Judge, Petitioner was ordered removed to her native Honduras.  Dkt. 23 at 37–40.  For the next two years, Petitioner

---

[2] "Form I-200 (Rev. 08/01/07) N."  Compl. at 27.

[3] "DHS Form I-862 (2/20)."  Compl. at 23.

[4] "DHS Form I-286 (1/14)."  Compl. at 29.

regularly checked in with and was monitored by U.S. Immigration and Customs Enforcement ("ICE").[5]  Compl. at 14.

On June 3, 2025, Petitioner reported to a BI Incorporated Office in Framingham, Massachusetts, where she was met by three ICE officers who informed her that there was "a warrant for her arrest."[6]  Compl. at 32.  Petitioner was then placed in handcuffs and taken to the ICE Field Office in Burlington, Massachusetts.  *Id.*

### B.    Procedural Background

Two days later, June 5, 2025, Petitioner sought a writ of habeas corpus in this Court. Dkt. 1.[7]  On June 12, 2025, Respondents opposed the Petition, arguing that, based on her removal order, Petitioner was properly detained under 8 U.S.C. § 1231 ("section 1231") and ineligible for bond.  Dkt. 17 at 2–6.  As Respondents explained it,

> Section 1226(a) Title 8 of the U.S. Code generally governs the detention of noncitizens during their removal proceedings.  It provides that ICE may detain a noncitizen "pending a decision on whether [he] is to be removed from the United States."  8 U.S.C. § 1226(a).  Noncitizens who are detained under § 1226(a) may be released "on . . . bond" or "conditional parole."  *Id.*  After ICE makes the initial decision to detain a noncitizen, the noncitizen may request a bond hearing in Immigration Court at any time before a removal order becomes final.  8 C.F.R. § 236.1(d)(1). . . . Once a noncitizen becomes subject to an administratively final removal order, the authority for his detention typically shifts from § 1226 to

---

[5] Neither party addresses why Petitioner was not removed during the two years following her order of removal.  It is not technically relevant for purposes of her Petition.  However, the Court notes its assumption that Petitioner's removal was complicated by the "[n]umerous environmental, political, and social crises" that "impair[ed]" Honduras from ensuring the safe return of its nationals."  *See Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Honduras*, 88 Fed. Reg. 40304-01 (June 21, 2023).

[6] BI Incorporated is a private contractor that provides ICE with surveillance and supervisory services.  *See* Pablo E. Paez, *The GEO Group Announces Five-Year Contract With U.S. Immigration and Customs Enforcement for Intensive Supervision and Appearance Program (ISAP)*, The GEO Group, Inc., https://investors.geogroup.com/news-releases/news-release-details/geo-group-announces-five-year-contract-us-immigration-and (Mar. 24, 2020) [https://perma.cc/K8L8-AR37].

[7] The original complaint was filed on Petitioner's behalf.  *See* Dkt. 1.  Petitioner has since been substituted as Plaintiff.  *See* Dkt. 28.  Respondents do not raise any extant standing issues.  *See generally* Dkt. 30; *cf.* Dkt. 17 at 7 (raising standing issue as to the original complaint).

8 U.S.C. § 1231(a). . . . Noncitizens who are detained under § 1231(a) are not entitled to bond hearings before an IJ.

*Id.* at 3–4.

On June 13, 2025, the Court held a hearing. Dkt. 18. Following that hearing, the parties proposed, and the Court adopted, a further briefing schedule.[8] Dkts. 20, 24.[9]

In the interim, there were developments in the immigration court. On July 7, 2025, an Immigration Judge granted an unopposed motion by Petitioner to reopen her removal proceedings, finding that Petitioner had been prejudiced in her prior proceedings due to ineffective assistance of counsel. Compl. at 20. As a result, the original basis for Petitioner's detention (her order of removal), *see* Dkt. 17 at 2–6, now lacked legal force and effect.[10]

---

[8] The Court elides a significant, though technically not relevant, aspect of Petitioner's allegations. On June 10, 2025, Respondents notified the Court that they intended to transfer Petitioner out of the District. Dkt. 10. In their Notice, Respondents stated that Petitioner was being housed "in a temporary holding facility not designed for long term detention" and that it would be "in Petitioner's best interest to be relocated." *Id.* at 1–2. On June 12, 2025, in an amended complaint, Petitioner significantly expounded on the conditions of her detention and sought relief, in part, based on her Eighth Amendment right to humane confinement. Dkt. 16 ¶ 12. Specifically, Petitioner alleged that she was being held "without access to showers, meaningful access to counsel, without a bed or cot, . . . with only a mylar blanket in a cold room, without access to natural light through a window or time outdoors, and without feminine hygiene products which she needed and was denied for at least four days." *Id.*; *see also* Dkt. 23 at 44–45 ("There were around eighteen other women who were also being detained. I was forced to sleep on the cold floor. There was not enough food, and sometimes we were only given crackers. We were also not given sanitary pads for those of us[] who were on our period. We were forced to share and divide up three pads among all of us."). At the June 13, 2025 hearing, the Court acknowledged that both sides seemed to agree that Petitioner was not being housed appropriately. June 13, 2025 Hr'g Rough Tr. at 15:4–16. However, it also appeared to be the case that allowing Petitioner to be transferred to a different facility, as Respondents sought, would alleviate that problem moving forward. The Court has not been presented with any information that this assumption was incorrect. Given the "prospective . . . nature," of habeas relief, *see Lindh v. Murphy*, 521 U.S. 320, 342 (1997) (Rehnquist, J., dissenting), the Court concluded that any grievance Petitioner may have as to her past treatment would not be a proper basis on which to grant release. Accordingly, although it finds no reason to doubt Petitioner's substantially unchallenged testimony, and expresses sympathy for any hardship, the Court believes it proper to focus attention elsewhere.

[9] The briefing that followed concerned Petitioner's motion to reopen her removal proceedings in the immigration court and contested whether that fact impacted the reasonable foreseeability of her removal. *See generally* Dkts. 22, 25. That line of argument is now superseded given the immigration court's decision to grant Petitioner's motion. *See* Compl. at 20.

[10] When a motion to reopen removal proceedings is granted, "that vacates the final order of removal." *Nken v. Holder*, 556 U.S. 418, 430 n.1 (2009) (quoting oral argument).

Petitioner thereupon requested a custody redetermination under section 1226(a).  *See* Compl. at 17.[11]  The Department of Homeland Security ("DHS") opposed the request, stating that Petitioner was ineligible for bond because she was an "applicant for admission" and therefore detained pursuant to section 1225, rather than section 1226.[12]  *Id.* at 34.  On July 17, 2025, the Immigration Judge denied Petitioner's request, agreeing with DHS that Petitioner was "statutorily ineligible for IJ custody redetermination."  *Id.* at 17.

The next day, the parties moved for a scheduling order to allow the Court to address the merits of the Petition in light of the developments in Petitioner's immigration proceedings.  *See* Dkts. 27, 29.  Petitioner amended her complaint accordingly, asking the Court to "find her detention is pursuant to Section 1226(a), declare that she is statutorily eligible for bond, and order her immediate release or, in the alternative, remand for a full bond hearing pursuant to Section 1226(a)."  Compl. at 2; *see also* Dkt. 26.  Respondents again opposed.  Dkt. 30.  As previewed above, on August 6, 2025, the Court held a hearing and ordered that Petitioner be granted a bond hearing under section 1226.  Dkt. 31.

C.    **Discussion**

1.    **Jurisdiction**

The Court has habeas jurisdiction under 28 U.S.C. § 2254.  That jurisdiction is not withdrawn, as Respondents argue, under 8 U.S.C. §§ 1252 (a)(5) and (b)(9) ("section 1252").  Finally, the Court finds that it would have been inappropriate to require Petitioner to exhaust her appeal to the Board of Immigration Appeals ("BIA") before seeking relief.

---

[11] Section 1226(a) provides for the conditional parole or bonded release of noncitizens during the pendency of their removal proceedings.  8 U.S.C. § 1226(a)(2); 8 C.F.R. § 1003.19.

[12] As discussed in greater detail below, detention under section 1225 does not provide for bonded release.

a.     <u>**Section 1252**</u>

Respondents argue that section 1252 strips this Court of jurisdiction to hear Petitioner's claim. Dkt. 30 at 7–10. However, the First Circuit has explicitly and repeatedly "held that district courts retain jurisdiction over challenges to the legality of detention in the immigration context." *Kong v. United States*, 62 F.4th 608, 614 (1st Cir. 2023) (quoting *Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 11 (1st Cir. 2007) (citing *Hernández v. Gonzales,* 424 F.3d 42, 42 (1st Cir. 2005))).[13] So, too, has the Supreme Court. In *Jennings v. Rodriguez*, 583 U.S. 281, the Court specifically held that section 1252 did not bar review of non-citizens' claims of entitlement to bond hearings pending resolution of their immigration proceedings. *Id.* at 292–95; *see also Johnson v. Guzman Chavez*, 594 U.S. 523, 533 n.4 (holding same, summarily citing *Jennings*).[14] These cases clearly demonstrate that this Court has jurisdiction to determine what legal authority governed Petitioner's detention and whether, as a result, Petitioner was entitled to a bond hearing. *See generally Jennings*, 583 U.S. 281 (doing precisely that).

Respondents' argument to the contrary relies alternatively on one of two mischaracterizations. First, Respondents claim that Petitioner is "challenging the [Government's] decision to detain [her] in the first place." Dkt. 30 at 10. But challenging denial of a bond hearing

---

[13] Although section II-A of Justice Alito's *Jennings* opinion, concerning section 1252, was joined only by a plurality of the Court, *see Jennings*, 583 U.S. at 284 (noting that Justices Roberts and Kennedy joined that part of the opinion), three additional justices reached the same conclusion in dissent. *See id.* at 355 (Breyer, J., dissenting) ("Jurisdiction also is unaffected by 8 U.S.C. § 1252(b)(9), which by its terms applies only '[w]ith respect to review of an order of removal under [§ 1252(a)(1) ].' § 1252(b). The respondents challenge their detention without bail, not an order of removal.'" (brackets in original)). This Court therefore properly gives *Jennings*'s jurisdictional holding its full precedential value based on "common ground shared by five or more justices." *See United States v. Johnson*, 467 F.3d 56, 64 (1st Cir. 2006) (quoting *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1182 (2d Cir. 1992)).

[14] *See also* 8 C.F.R. § 1003.19(d) ("Consideration by the Immigration Judge of an application or request of a respondent regarding custody or bond under this section shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding.").

is not the same thing as challenging the initial detention decision, as the Supreme Court has made clear. *Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (citing *Jennings*, 583 U.S. at 294). In her operative complaint, Petitioner clearly bases her claim on "the Immigration Judge's erroneous denial of her motion for bond redetermination." Compl. at 1. Therefore, section 1252 "does not present a jurisdictional bar." *Nielsen*, 586 U.S. at 402.

Next, Respondents cite misleadingly to Justice Thomas's separate opinion in *Jennings*:

> Indeed, the fact that Petitioners are challenging the basis upon which they are detained is enough to trigger § 1252(b)(9) because 'detention *is* an "action taken . . . to remove" an alien.' *See Jennings*, 583 U.S. 318, 319 (Thomas, J., concurring).

Dkt. 30 at 10 (emphasis in *Jennings*).[15]  To start, Justice Thomas's opinion is not a "concurring" opinion, *id.*, but rather a concurrence *in part* and a concurrence in the judgment. *Jennings*, 583 U.S. at 314. This is more than a schoolmarmish technicality because the section of the opinion quoted by Respondents explicitly *contradicts* the plurality's (and dissent's) jurisdictional holding, as Justice Thomas himself recognized:

> The plurality asserts that § 1252(b)(9) covers respondents' claims only if the words "arising from" are given an "expansive interpretation." *Ante*, at 840. **I am of a different view.** Even if "arising from" is read narrowly, § 1252(b)(9) still covers the claims at issue in this case. That is because detention *is* an "action taken . . . to remove" an alien.

*Id.* at 318 (Thomas, J., concurring in part and concurring in the judgment) (first emphasis added, second emphasis in original). Respondents' reliance on a functionally dissenting opinion that contradicts the holding of the Court is obviously improper.

**b.**     **BIA Exhaustion**

Next, Respondents argue that Petitioner is required to exhaust her BIA appeal before seeking habeas relief. Dkt. 30 at 10–14. "There are two species of exhaustion: statutory and

---

[15] To be clear, there is only one Petitioner in this case.

common-law." *Brito v. Garland*, 22 F.4th 240, 255 (1st Cir. 2021). "The former deprives a federal court of jurisdiction, while the latter 'cedes discretion to a [federal] court to decline the exercise of jurisdiction.'" *Id.* (quoting *Anversa v. Partners Healthcare Sys., Inc.*, 835 F.3d 167, 174 (1st Cir. 2016)).

### i. <u>Statutory</u>

Here, no statute requires exhaustion. *See Gomes*, 2025 WL 1869299, at *4–5. Respondents state summarily that section 1252 does. *See* Dkt. 30 at 10.[16] But that wrongly conflates an individual's right to appeal her bond decision to the BIA, *see* 8 C.F.R. § 1003.19(f), with the mechanism for challenging issues related to removal via a petition for review in a court of appeals, *see* 8 U.S.C. § 1252(a)(5). *See Hernández*, 424 F.3d at 42 (holding that section 1252 "d[id] not apply" to non-citizen's habeas petition "challeng[ing] . . . [his] detention rather than his removal").

The Court detours briefly to clear up one related point of confusion. Contrary to Respondents' repeated suggestion, courts of appeal do *not* have independent jurisdiction to review BIA bond decisions directly via any similar kind of petition.[17] *See, e.g.*, *Gudiel Polanco v. Garland*, 839 F. App'x 804, 805 (4th Cir. 2021) (explaining that the appeals court has jurisdiction to review "final orders of removal or deportation," not "request[s] for release on bond"); *Gomez De Chacon v. Barr*, 828 F. App'x 459, 460 (9th Cir. 2020) ("[T]his court does not adjudicate bond

---

[16] The Court notes the obvious contradiction in this argument. How could section 1252 both strip this Court of jurisdiction to hear Petitioner's claim, *see* Dkt. 30 at 7–10, while also requiring her "to exhaust her administrative remedies prior to seeking habeas relief in this court"? *See id* at 10. Respondents do not address this contradiction, nor do they attempt to follow it further. *See id.* at 11–14 (addressing factors relevant to the Court's discretionary decision with respect to exhaustion).

[17] *See, e.g.*, August 6, 2025 Hr'g Rough Tr. ("Tr.") at 12:3–8 ("[ASSISTANT U.S. ATTORNEY]: . . . There is no issue about the jurisdiction before the Immigration court here. Clearly the Immigration court has jurisdiction, clearly the BIA has jurisdiction, and clearly the First Circuit would have jurisdiction over any case by the -- any decision of the BIA. So there is no basis to not require exhaustion here.").

or custody status through a petition for review.").  Rather, "challenges to an alien's detention must be brought pursuant to a habeas corpus petition" in district court.  *Guidel Polanco*, 839 Fed. App'x at 805; *see also, e.g.*, *De Ming Wang v. Brophy*, 2019 WL 4199901, at *1 (2d Cir. Aug. 1, 2019) ("Appellee . . . cannot challenge an immigration judge's denial of bond in this Court in the first instance." (citing Fed. R. App. P. 22(a) ("An application for a writ of habeas corpus must be made to the appropriate district court."))); *Ben Halim v. Ashcroft*, 107 F. App'x 1, 6 (7th Cir. 2004) ("[T]o the extent Ben Halim is entitled to any form of judicial review of the bond determination, it would be through a habeas corpus petition." (citing *Demore v. Kim*, 538 U.S. 510, 517 (2003))).  These examples further demonstrate that this type of claim is not within the scope of section 1252.  *See Hernández*, 424 F.3d at 42.  Moreover, to the extent Respondents have argued pragmatically that a BIA appeal would have the benefit of appellate review (and on a faster track)—that argument is based on a plain misreading of the law, as there is no path from the denial of a bond appeal by the BIA to any appellate court.[18]

## ii. <u>Common Law</u>

The Court will not itself require exhaustion in this case.  Since no statute requires it, "sound judicial discretion governs."  *Morgan v. Garland*, 120 F.4th 913, 927 (1st Cir. 2024) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)).  In making that decision, the Court "must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion."  *Anversa*, 835 F.3d at 176 (quoting *McCarthy*, 503 U.S. at 146).  Although "the exhaustion doctrine ordinarily 'serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency,' and,

---

[18] *See, e.g.*, Tr. at 24:4–9 ("[ASSISTANT U.S. ATTORNEY]: . . . But I also want to add, Your Honor, and I -- I think this will actually support the exhaustion claim.  There is another avenue for this to get up to the First Circuit which we think is the appropriate place for this to be decided, and that is to appeal to the BIA and then appeal any adverse decision to the First Circuit.  So there is another avenue.").

thus, should customarily be enforced, the [Supreme] Court identified 'three broad sets of circumstances in which the interests of the individual weigh heavily against requiring administrative exhaustion.'" *Portela-Gonzalez v. Sec'y of the Navy*, 109 F.3d 74, 77 (1st Cir. 1997) (quoting *McCarthy*, 503 U.S. at 145, 146).

> First, a court may consider relaxing the rule when unreasonable or indefinite delay threatens unduly to prejudice the subsequent bringing of a judicial action. *See* [*McCarthy*, 503 U.S.] at 146–47. And, relatedly, if the situation is such that "a particular plaintiff may suffer irreparable harm if unable to secure immediate judicial consideration of his claim," exhaustion may be excused even though "the administrative decisionmaking schedule is otherwise reasonable and definite." *Id.* at 147.

> Second, *McCarthy* acknowledges that it sometimes may be inappropriate for a court to require exhaustion if a substantial doubt exists about whether the agency is empowered to grant meaningful redress. *See id.* at 147–48, 154; *see also Gibson v. Berryhill*, 411 U.S. 564, 575 n.14 (1973). An agency, for example, may lack authority to grant the type of relief requested. *See, e.g., McNeese v. Board of Educ.*, 373 U.S. 668, 675 (1963).

> Finally, *McCarthy* teaches that the exhaustion rule may be relaxed where there are clear, objectively verifiable indicia of administrative taint. Thus, if the potential decisionmaker is biased or can be shown to have predetermined the issue, failure to exploit an available administrative remedy may be forgiven. *See McCarthy*, 503 U.S. at 148.

*Id.*

Taking that guidance into account, the Court finds that waiver is appropriate. "Consistent with the exceptions limned by the *McCarthy* Court," the First Circuit has "recognized the inappropriateness of requiring exhaustion when further agency proceedings would be futile." *Id.* at 78. "Reliance on the exception in a given case must be anchored in demonstrable reality. A pessimistic prediction or a hunch that further administrative proceedings will prove unproductive is not enough to sidetrack the exhaustion rule." *Id.*

Petitioner's case warrants waiver under that standard. Respondents themselves argue that Petitioner's case is foreclosed by BIA precedent. *See, e.g.*, Dkt. 30 at 5, 15 (citing *Matter of Q.*

*Li*, 29 I. & N. Dec. 66 (B.I.A. 2025)).  The BIA, as part of the Executive Office for Immigration Review ("EOIR"), operates under DOJ authority.  *See* 8 C.F.R. § 1003.1.  In another pending lawsuit dealing with this precise issue, where the Attorney General and EOIR are named defendants, the DOJ has taken the position that an individual in Petitioner's position is not entitled to an individualized bond hearing.  *See* Defs.' Mot. to Dismiss, *Rodriguez Vazquez v. Bostock*, 3:25-cv-05240-TMC, Dkt. 49 at 30–33 (W.D. Wash. June 6, 2025); Defs.' Reply in Supp. of Mot. to Dismiss, *Rodriguez Vazquez*, 3:25-cv-05240-TMC, Dkt. 57 at 11–13 (July 7, 2025).  Just last month, DHS issued an internal memorandum, "in coordination with the Department of Justice (DOJ)," affirming that section 1225 "is the applicable immigration detention authority for all applicants for admission."[19]  It is further worth noting that a former Immigration Judge from the Chelmsford Immigration Court—the court that denied Petitioner's bond request, *see* Compl. at 17—recently stated in an interview that he "was told to rule in a certain way" by his superiors, who "also had pressure from above."[20]  The Court need not wring its hands too hard over this last point—after all, this Court is likewise bound to rule according to the decisions of its superiors, and immigration courts' authority ultimately derives from the executive branch, rather than the judicial.  By the same token, however, the prospect of an unaffected decisionmaker seems unrealistically thin, and the Court finds little to be gained, in terms of insight into the Executive's point of view, from making Petitioner go through the vain exercise of getting denied once again.

Finally, Respondents have cited a handful of district court cases finding, in the context of an exhaustion analysis, that detention during "appeal of an order denying a bond is [not]

---

[19] *See Diaz Martinez*, 2025 WL 2084238, at *4 & nn.10–11 (citing Acting ICE Director Todd M. Lyons's July 8, 2025 memorandum, "Interim Guidance Regarding Detention Authority for Applicants for Admission").

[20] Oscar Margain, *Fired immigration judges describe threat to judicial independence from Justice Dept.*, NBC Boston, https://www.nbcboston.com/news/local/fired-us-immigration-judge-interviews/3776340/ (July 25, 2025) [https://perma.cc/G6FL-8D73].

necessarily irreparable harm." *See, e.g.*, *Meneses v. Jennings*, 2021 WL 4804293, at *5 (N.D. Cal. Oct. 14, 2021), *abrogated on other grounds by Doe v. Garland*, 109 F.4th 1188 (9th Cir. 2024).[21] *But see Brito v. Garland*, 22 F.4th 240, 256 (1st Cir. 2021) ("[E]xhaustion might not be required if [the petitioner] were challenging her incarceration . . . or the ongoing deprivation of some other liberty interest." (quoting *Bois v. Marsh*, 801 F.2d 462, 468 (D.C. Cir. 1986))). To the extent these cases seem to say that the fact of detention is not "decisive" to a court's exhaustion analysis, *see Delgado v. Sessions*, 2017 WL 4776340, at *2 (W.D. Wash. Sept. 15, 2017), *report and recommendation adopted*, 2017 WL 4700360 (W.D. Wash. Oct. 19, 2017), this Court is inclined to agree. *See, e.g.*, *Bogle v. DuBois*, 236 F. Supp. 3d 820, 823 n.6 (S.D.N.Y. 2017) (reasonably pointing out that if detention were always considered sufficient to waive exhaustion, that would effectively "swallow the rule." (quoting *Giwah v. McElroy*, 1997 WL 782078, at *4 (S.D.N.Y. Dec. 19, 1997))).

However, to the extent these cases are read to say that loss of liberty resulting from detention is somehow not a form of irreparable harm that might weigh into a court's analysis, this Court respectfully disagrees. "Obviously, the loss of liberty is a . . . severe form of irreparable injury." *Ferrara v. United States*, 370 F. Supp. 2d 351, 360 (D. Mass. 2005). "[T]he interest in being free from physical detention by one's own government" is "the most elemental of liberty interests." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004). "The interest of the habeas petitioner in release pending appeal [is] always substantial." *Hilton v. Braunskill*, 481 U.S. 770, 777 (1987). Of course, that does not mean that the fact of detention will "necessarily" carry the day, *Meneses*,

---

[21] *See also Reyes v. Wolf*, 2021 WL 662659, at *3 (W.D. Wash. Feb. 19, 2021) (citing *Aden v. Nielsen*, 2019 WL 5802013, at *3 (W.D. Wash. Nov. 7, 2019)), *aff'd sub nom. Diaz Reyes v. Mayorkas,* 2021 WL 3082403 (9th Cir. July 21, 2021); *Chavez v. Immigr. & Customs Enf't Field Off. Dir.*, 2024 WL 1661159, at *3 (W.D. Wash. Jan. 25, 2024), *report and recommendation adopted*, 2024 WL 1658973 (W.D. Wash. Apr. 17, 2024).

2021 WL 4804293, at *5, as is always true when courts weigh prudential factors.  But it would be perverse to find that loss of liberty somehow suddenly stops being irreparable harm just because it is being considered in the immigration context.

Here, the weight of the evidence shows that the DOJ has already made its position clear. It would be inappropriate to force Petitioner to put a finer point on it.

### 2.  Merits

Turning to the merits of the Petition, the Court finds that Petitioner's most recent period of detention was ultimately governed by section 1226.  Pending her initial removal proceedings, Petitioner was arrested and released under section 1226.  Compl. at 27, 29.  Upon being ordered removed, "the authority for [her] detention . . . shift[ed] from § 1226 to 8 U.S.C. § 1231(a)." Dkt. 17 at 4.  It follows that, upon the Immigration Judge's reopening of Petitioner's removal proceedings, that the authority for her detention "shift[ed]" back, *id.*, to section 1226. Accordingly, Petitioner had a right under section 1226 and its regulations to an individualized bond hearing, *see* 8 C.F.R. § 1003.19, which this Court granted.[22]

### a.  History of Treatment

The abstract statutory interpretation issues raised by this case must be considered against the backdrop of one uncontestable fact—Petitioner has always been treated by Respondents as subject to discretionary detention under section 1226, rather than mandatory detention under section 1225.  *See* Compl. at 27 ("Warrant for Arrest of Alien . . . as authorized by section 236 of the Immigration and Nationality Act");[23] *id.* at 29 ("Notice of Custody Determination," releasing

---

[22] Below, the Court considers without deciding whether immediate release would have been the more appropriate remedy.

[23] *Cf. Florida v. United States*, 660 F. Supp. 3d 1239, 1276 n.29 (N.D. Fla. 2023) ("[T]he Court credits the testimony of DHS's Rule 30(b)(6) witness who testified that a warrant (administrative or otherwise) is not obtained before the alien is released."), *appeal dismissed*, 2023 WL 5212561 (11th Cir. July 11, 2023).

Petitioner on her own recognizance, "[p]ursuant to the authority contained in section 236 of the Immigration and Nationality Act");[24] *see also Diaz Martinez*, 2025 WL 2084238, at *3 (explaining why these are not only facially but logically irreconcilable with an individual's having been previously detained or processed under section 1225).[25]   Indeed, *in this very litigation*, Respondents explained Petitioner's detention in terms of section 1226, rather than section 1225. *See* Dkt. 17 at 3–4 (repeatedly referencing section 1226, never once mentioning section 1225).

It was moreover correct for Respondents to treat Petitioner as subject to discretionary detention under 1226, rather than section 1225, given that she was then already "present in the United States"—or, perhaps more to the point, that she was no longer "an arriving alien."  *See* Compl. at 23; 8 C.F.R. § 235.3(c)(1) ("Except as otherwise provided in this chapter, any ***arriving alien*** who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to section [1229a] shall be detained in accordance with section [1225(b)]." (emphasis added)); *see also Diaz Martinez*, 2025 WL 2084238, at *3–7 (providing further elaboration).  To be clear, that Petitioner was "present in the United States" and not "an arriving alien" are determinations made by Respondents' own agent.  Compl. at 23.  To the extent Respondents ask this Court to overrule that determination, *see* Dkt. 30 at 16 (arguing that the Court's ruling in *Diaz Martinez* was predicated on "a CBP officer's failure to tick a box"), they have provided no factual or legal basis for the Court to do so.  "To be sure, the line between when a person is 'seeking admission' as opposed to being 'already in the country' is not necessarily obvious.  For instance, someone who has just crossed the border may technically be 'in' the country

---

[24] "[S]ection 236 of the Immigration and Nationality Act" is codified at section 1226 in the U.S. Code.

[25] *Cf. Florida*, 660 F. Supp. 3d at 1275–76 & n.29 ("[T]he evidence at trial showed that DHS is initially processing applicants for admission . . . under § 1225, and there is nothing in the [Immigration and Nationality Act] that contemplates that processing can switch between § 1225 and § 1226.").

but is still treated as 'an alien seeking initial entry.'" *Lopez Benitez*, 2025 WL 2371588, at *4 (quoting *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 114 (2020)). Nevertheless, at least in the first instance, the officer's own determination must be afforded some deference, and the Court has been given nothing better to go on in the end.

### b.   Plain Meaning

Respondents' real argument is that, notwithstanding the above, section 1225(b)(2)(A) applies (and likely should have always applied) to govern Petitioner's detention during the pendency of her immigration proceedings because she is an "applicant for admission," as that term is defined in the statute, and all "applicants for admission" are subject to section 1225(b)(2)(A). Dkt. 30 at 14–19. This argument reflects a novel interpretation of the immigration detention statutes, adopted by DHS about a month ago. *See Diaz Martinez*, 2025 WL 2084238, at *4–5 & nn.9–11 (D. Mass. July 24, 2025).[26] As the Court has previously explained, Respondents' new interpretation is contrary to the agency's own implementing regulations, *id.* at 6 & nn.14, 16; its published guidance, *id.* at 8; the decisions of its immigration judges (until very recently), *id.*; decades of practice, *id.* at 4 & nn.9–11; the Supreme Court's gloss on the statutory scheme, *id.* at 8; and the overall logic of our immigration system, *id.*[27] Given this context, the Court continues to treat "Respondents' assertion of a 'previously "unheralded power"'" to detain non-citizens present in the United States under section 1225(b)(2)(A) with "'a measure of skepticism.'" *Id.* at 8 & n.22 (quoting *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 748 (2022) (Gorsuch, J., concurring) (quoting *Util. Air Regul. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 324 (2014))).

---

[26] Indeed, it is so new that one can roughly date its emergence by looking at Respondents' briefs in this very case. *Compare* Dkt. 17 (explaining Petitioner's detention with reference to section 1226), *with* Dkt. 30 (explaining it in terms of section 1225).

[27] The Court does not find it necessary to rehash every point laid out in *Diaz Martinez*. Nevertheless, to be clear, the Court maintains and incorporates that reasoning.

But putting all of that to the side, the Court bases its reading chiefly on the plain text of the statute. *See United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) ("'[E]very clause and word of a statute' should have meaning." (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883))); *United States v. Abbas*, 100 F.4th 267, 283 (1st Cir. 2024) ("'We begin, as always, with the text of the statute' and read it 'according to its plain meaning at the time of enactment.'" (internal quotation marks removed) (quoting *United States v. Winczuk*, 67 F.4th 11, 16 (1st Cir. 2023))), *cert. denied*, 145 S. Ct. 319 (2024). With those principles in mind, the Court concluded that "for section 1225(b)(2)(A) to apply, several conditions must be met—in particular, an 'examining immigration officer' must determine that the individual is: (1) an 'applicant for admission'; (2) 'seeking admission'; and (3) 'not clearly and beyond a doubt entitled to be admitted.'" *Diaz Martinez*, 2025 WL 2084238, at *2 (quoting section 1225). In particular, the Court observed that "not every encounter with an immigration officer necessarily constitutes an examination under section 1225," *id.* at *3, and that the phrase "seeking admission," otherwise undefined in the statute, necessarily requires some "some sort of present-tense action," *id.* at *6.

Respondents do not acknowledge the first point. This is significant because "examination" is not an unbounded concept. Rather, it is the specific legal process one undergoes while trying to enter the country. *See* 8 C.F.R. § 235.1 ("Scope of examination"). Respondents have simply put forward no evidence that Petitioner was arrested pursuant to an examination within the meaning of section 1225.

As to the second, Respondents argue that the phrase "alien seeking admission" is "synonymous" with the phrase "applicant for admission." Dkt. 30 at 15–16. This is plainly incorrect. To be an "applicant for admission," one must be "present in the United States" or otherwise "arriv[ing] in the United States." 8 U.S.C. § 1225(a)(1). In other words, to be an

"applicant for admission," one must actually be here, either in the United States or at its door. By contrast, one can "seek admission" from anywhere in the world, "for example, by applying for a visa at a consulate abroad." *Matter of Lemus-Losa*, 25 I. & N. Dec. 734, 741 (BIA 2012).[28] Thus, giving separate meaning to the phrase "seeking admission" does not "read[] 'applicant for admission' out of [section] 1225(b)(2)(A)." Dkt. 30 at 16. Rather, it sensibly understands the statute to contain separate requirements for presence ("applicant for admission") and present-tense action ("seeking admission"). Reading out "applicant for admission," as Respondents accuse the Court of doing, would produce a far less reasonable result—a statute that spoke *only* of non-citizens "seeking admission" would require DHS to take into custody foreign nationals applying to enter the United States at embassies abroad until their visa applications are resolved.

Giving separate meaning to these phrases also makes sense of section 1225(a)(3), which requires the inspection of "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States." Again, and importantly, this subsection demonstrates that the categories "applicants for admission" and "seeking admission" are not coterminous. An individual seeking admission can (indeed, "shall") be inspected whether

---

[28] *Lemus-Losa* concerned what it means to "'again seek[] admission' within the meaning of" 8 U.S.C. § 1182(a)(9)(B)(i)(II) and, in particular, whether that criterion for ineligibility was susceptible to a particular exception established in an earlier line of cases. *See Lemus-Losa*, 25 I. & N. Dec. at 739–40. The BIA was responding to a suggestion by the Seventh Circuit that one who "seeks admission" is necessarily less culpable because that person is "ostensibly 'willing to play by the rules.'" *Id.* at 742 (quoting *Lemus-Losa v. Holder*, 576 F.3d 752, 761 (7th Cir. 2009)). The BIA rightly corrected this notion by pointing out that "many people who are not *actually* requesting permission to enter the United States in the ordinary sense are nevertheless deemed to be 'seeking admission' under the immigration laws." *Id.* at 743. That is consistent with this Court's understanding of the phrase "seeking admission" in section 1225(b)(2)(A), insofar as it includes "arriving" in the United States, including at a place other than a designated port of entry. *See Diaz Martinez*, 2025 WL 2084238, at *6. Indeed, "arriving" has been the regulatory gloss for the statute's several requirements—an "applicant . . . seeking admission" during an "examin[ation]," 8 U.S.C. § 1225(b)(2)(A)—for nearly thirty years. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312-01, 1997 WL 93131 (Mar. 6, 1997). *Lemus-Losa* does include other language that might be read to conflate "applicants for admission" with "seeking admission." *See Lemus-Losa*, 25 I. & N. Dec. at 743. Even so, it does not follow that the opinion supports Respondents' overall interpretation or lends it any historical credence. Indeed, in 2023, the BIA stated that it was "unaware of any precedent" that would support Respondents' position. *See Diaz Martinez*, 2025 WL 2084238, at *8 (quoting an unpublished BIA decision).

or not they are present or arriving in the United States, *i.e.*, whether or not they are an "applicant for admission." *See, e.g.*, 8 U.S.C. § 1225a(a) (requiring preinspection at certain foreign airports); 19 U.S.C. § 1629 (authorizing inspection of persons and merchandise "prior to their arrival in . . . the United States").

So far, it is at least clear that "applicant for admission" and "seeking admission" are not "synonymous." *Cf.* Dkt. 30 at 15–16. Nevertheless, one might try to argue (as Respondents have) that all "applicants for admission" are necessarily (and continuously) "seeking admission," so long as they continue to exist in the United States.[29] *Id.* at 16 n.5 ("Petitioner remains an applicant for admission who is 'seeking admission.'"). This is an obvious violation of the rule against surplusage. *See Diaz Martinez*, 2025 WL 2084238, at *4–7. It also goes against "the plain, ordinary meaning of the words 'seeking' and 'admission.'"[30] *Lopez Benitez*, 2025 WL 2371588, at *7.

Nevertheless, Respondents attempt to dodge these problems by pointing to section 1225(a)(3) and arguing that its language, which refers to "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission," demonstrates that applicants for admission "are understood to be 'seeking admission'" within section 1225. *See* Dkt. 30 at 15–16 (citing *United States v. Woods*, 571 U.S. 31, 45 (2013)).[31]

---

[29] In other words, to make sense of Respondents' argument, one would have to say that all applicants are seeking admission, but not all who seek admission are applicants.

[30] *See also* 8 U.S.C. § 1101(a)(13)(A) (defining "admission" as, "with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.").

[31] Although not the most important point, the Court notes that the case cited here by Respondents to suggest that the word "or" "introduce[s] an appositive" actually says that the opposite is generally true. *See* Dkt. 30 at 15–16 (citing *United States v. Woods*, 571 U.S. 31, 45 (2013) ("Moreover, the operative terms are connected by the conjunction 'or.' While that can sometimes introduce an appositive—a word or phrase that is synonymous with what precedes it . . . —its ordinary use is almost always disjunctive, that is, the words it connects are to 'be given separate meanings.'" (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979))).

But Respondents' argument does not follow from the text. An illustration is helpful to demonstrate why this is so. Below, the Court reproduces the relevant statutory language alongside a comparable construction, using more familiar language:

|  | *Compare*<br><br>(original) | *With*<br><br>(demonstrative) |
|---|---|---|
| Section 1225(a)(3) | All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers. | All craftsmen (including union-members) who are carpenters or otherwise woodworking shall be inspected by safety compliance officers. |
| Section 1225(b)(2)(A) | in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title. | in the case of a craftsman who is a carpenter, if the examining safety compliance officer determines that a craftsman woodworking is not wearing his safety goggles, the craftsman shall pay a fine. |

In the above, focusing on the demonstratives, the meaning is clear: everyone who works with wood is required to undergo a safety inspection—paradigmatically, that will mean carpenters, but the real thrust is anyone woodworking. The latter-enunciated fine, however, applies only if all the conditions are met: the craftsman is a carpenter; he is woodworking; he is undergoing an examination; and he is not wearing his safety glasses. Notwithstanding the obvious linguistic and logical connections between the concepts of a "carpenter" and "woodworking," no reasonable person would understand the carpenter to be at risk of receiving a fine for not wearing his safety goggles when not woodworking. Likewise, anyone seeking admission—for the most part,

applicants—"shall be inspected."  8 U.S.C. § 1225(a)(3).  However, the mandatory detention provision applies only if the individual is an applicant; is "seeking admission;" and is determined by an "examining immigration officer" to be "not clearly and beyond a doubt entitled to be admitted."  *Id.* § 1225(b)(2)(A).

### c.    <u>Statutory Scheme</u>

This plain reading of section 1225 harmonizes it with section 1226.  Taken together, these two statutes principally govern the detention of noncitizens pending removal proceedings—section 1225 governs detention of non-citizens "seeking admission into the country," whereas section 1226 governs detention of non-citizens "already in the country."  *Jennings*, 583 U.S. at 288–89 ("[A]n alien present in the country may still be removed if he or she falls 'within one or more . . . classes of deportable aliens.'  [8 U.S.C.] § 1227(a).  That includes aliens who were inadmissible at the time of entry . . . . *See* [8 U.S.C. §] 1227(a)(1). . . . ***Section 1226 generally governs the process of arresting and detaining that group of aliens pending their removal.***" (emphasis added)).

Respondents cast the distinction between these two statutes in terms of "the specific governs the general," with section 1226 as the general detention statute and section 1225 applying specifically to applicants for admission.  *See* Dkt. 30 at 14 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)).  This argument misunderstands the requirements of section 1226, which applies only where a noncitizen is arrested "[o]n a warrant . . . pending a decision on whether the alien is to be removed from the United States."  8 U.S.C. § 1226(a).  Thus, section 1226 does not apply either: 1) where there is no warrant; or 2) where the individual is not facing "remov[al] from the United States," *i.e.*, where detention is pending a decision on whether the person can be *let into* the United States.  In those cases, where otherwise appropriate, section 1225 can apply.  It is therefore simply incorrect to say that section 1225 is more "specific" than

section 1226.  Rather, they are "mutually exclusive," as the Government has acknowledged in at least one other case.  *Lopez Benitez*, 2025 WL 2371588, at *4.  Indeed, as the Attorney General has previously recognized, "section [1225] (under which detention is mandatory) and section [1226] (under which detention is permissive) can be reconciled only if they apply to different classes of aliens."  *Matter of M-S-*, 27 I. & N. Dec. 509, 516 (Att'y Gen. 2019).

Applying section 1225 to noncitizens "already in the country," as Respondents argue, *but see Jennings*, 583 U.S. at 289, would make a recent amendment to section 1226—adopted in 2025 by the Laken Riley Act—superfluous.  *See Gomes*, 2025 WL 1869299, at *5–8.  This is a presumptively dubious result given that "the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."  *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).  In short, section 1226 allows for non-citizens to be released on bond during the pendency of their immigration proceedings.  *See* 8 U.S.C. § 1226(a).  However, it carves out certain disfavored noncitizens who may not be released on bond. *Id.* § 1226(c).  Among those, anyone who is "present in the United States without being admitted or paroled," *id.* § 1182(a)(6)(A), "***and***" "is charged with, is arrested for, is convicted of, admits having committed, or admits committing" certain crimes is ineligible for bond.  *Id.* § 1226(c)(1)(E)(i)–(ii) (emphasis added).  However, if, as Respondents argue, applicants for admission—"alien[s] present in the United States who ha[ve] not been admitted," 8 U.S.C. § 1225(a)(1)—are ineligible for bond by way of section 1225(b)(2)(A), then the exception provided for in section 1226 is a nullity.  *But see Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.").

22

Respondents brush this off as a simple "redundancy," likening it to the one observed by the Supreme Court in *Barton v. Barr*, 590 U.S. 222, 239 (2020).  Dkt. 30 at 18.  However, the two are not alike.  The language at issue in *Barton* concerned the commission of acts that rendered a noncitizen "inadmissible to the United States under section 1182(a)(2) . . . or removable from the United States under section 1227(a)(2) or 1227(a)(4)."  *Barton*, 590 U.S. at 238 (emphasis removed) (quoting 8 U.S.C. § 1229b(d)(1)(B)).  Put simply, the issue was that both sets included "crime[s] involving moral turpitude."  *See Barton*, 590 U.S. at 239; 8 U.S.C. §§ 1182(a)(2), 1227(a)(2).  This is not egregious—one can talk about crimes committed "under U.S. or Canadian law" without being thought redundant, though both countries proscribe murder.

By contrast, Respondents' reading of sections 1225 and 1226 is better conceived as a contradiction.  Where "Congress has created specific exceptions" to a rule, it "proves" the general applicability of that rule, absent those exceptions.  *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010).  Thus, by creating a specific exception, disallowing bond for certain applicants for admission, Congress clearly evinced its intent that bond remain available for the remainder.  At the very least, the exception demonstrates that Congress expected that the detention of some applicants for admission would be governed by section 1226.  This is intuitive—imagine a set of grocery instructions:

1) Buy fruit.
2) You may buy vegetables.  However, if the tomatoes look very red, then you must buy them.

In the above example, one understands—notwithstanding any pedantic argument that tomatoes are fruit—that buying tomatoes is intended to be optional, subject to conditions that might make buying tomatoes mandatory.  Likewise—notwithstanding Respondents' specious argument that applicants for admission necessarily satisfy the language of section 1225—read alongside section 1226, it is clear that those individuals are intended to be subject to the latter instruction.

d.    **Congressional Intent**

Laid bare, Respondents' is really a policy argument, projected onto Congress.  Respondents argue that "Congress did not intend to treat individuals who unlawfully enter the country between ports of entry better than those who appear at a port of entry."  Dkt. 30 at 17.  As Respondents themselves recognize, this is a second-tier consideration at best.  *Id.* ("When the plain text of a statute is clear, 'that meaning is controlling' and courts 'need not examine legislative history.'" (quoting *Succar v. Ashcroft*, 394 F.3d 8, 31 (1st Cir. 2005))).  Nevertheless, in some senses at least, Respondents are undoubtedly correct.  For example, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 altered the typology of immigration proceedings to "place[] on equal footing" "all immigrants who have not been lawfully admitted."  *Torres v. Barr*, 976 F.3d 918, 928 (9th Cir. 2020).  This, of course, says nothing about detention pending the outcome of those proceedings.  Indeed, as the *Torres* court recognized, it is reasonable to assume that Congress "would have made it plain" if it had intended such a major shift.  *Id.*  Realistically speaking, if Congress's intention was so clear, why did it take thirty years to notice?

In other senses, Respondents ask the wrong question.  The relevant distinction is not between "individuals who unlawfully enter the country between ports of entry" and those "who appear at a port of entry."  Dkt. 30 at 17.  Rather, it is between persons inside the United States and persons outside the United States.  That distinction is consistent with the long history of our immigration laws and with the Constitution.  "[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."  *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  It is therefore reasonable to read these statutes "against [that] backdrop."  *See Hewitt v. United States*, 605 U.S. —, 145 S. Ct. 2165, 2173 (2025).

A discretionary system becomes even more believable as what Congress intended when looked at purely in pragmatic terms. Certainly, mistakes can happen at the border.[32] But, in that limited space, there will at least usually be indicators, in most cases, of the broad circumstances. Respondents imagine a system, however, where any person, at any place or time, can be examined by an immigration officer as if at the border and then held without bond for failing to demonstrate their citizenship or entitlement to admission, without recourse to a judicial court until a lengthy administrative process is exhausted. Placed in those terms, Congress's intent is less obvious than Respondents suggest.

### 3.    **Remedy**

Concluding that Petitioner's detention was governed by section 1226, there remains the question of the proper remedy. In the first instance, the Court agrees with Respondents that the appropriate remedy will usually be a bond hearing to consider the merits of release under section 1226. *See, e.g.*, *Gomes*, 2025 WL 1869299, at *8–9. In Petitioner's case, however, the Court admits a degree of uncertainty. Insofar as the authority for Petitioner's detention "shift[ed]" back to section 1226(a) upon the immigration court's granting her motion to reopen, *see* Dkt. 17 at 4, it perhaps should have followed that the same conditional parole she enjoyed under that original form of detention, *see* Compl. at 29, applied again. *See dos Santos*, 2025 WL 2370988, at *8–9 (ordering immediate release based on preexisting bond order).[33]

---

[32] *See* U.S. Gov't Accountability Off., GAO-21-487, *Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations* (2021) (finding that ICE "arrested 674, detained 121, and removed 70 potential U.S. citizens" in a five-year study).

[33] This may only be an academic exercise given that DHS has authority to cancel parole. 8 U.S.C. § 1226(b). In exercising that authority, it is unclear whether DHS is limited by the same "change of circumstances" requirement as applies to the cancellation of bond, also provided for under section 1226. *See Matter of Sugay*, 17 I. & N. Dec. 637, 640 (BIA 1981).

In any event, the Court has already ordered the lesser remedy and will not disturb that decision now.[34]

## II.   <u>Conclusion</u>

For the foregoing reasons, the Court has GRANTED the Petition.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Judge, United States District Court

Dated:  August 19, 2025

---

[34] It appears that Petitioner has since been released on bond from the immigration court. Kevin G. Andrade, *Judge orders the release of New Bedford's first confirmed female detainee*, THE NEW BEDFORD LIGHT, https://newbedfordlight.org/judge-orders-the-release-of-new-bedfords-first-confirmed-female-detainee/ (Aug. 11, 2025) [https://perma.cc/4UZS-47DM].